```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
AARON CAMILO ECKERT,

                    Plaintiff,
                                          MEMORANDUM & ORDER
          -against-                       19-CV-0763(JS)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
----------------------------------X
APPEARANCES
For Plaintiff:        Francesca Zeltmann, Esq.
                      Persaud & Zeltmann
                      P.O. Box 283
                      Massapequa, New York 11758

For Defendant:        Candace S. Appleton, Esq.
                      United States Attorney's Office
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
```

SEYBERT, District Judge:

Plaintiff Aaron Camilo Eckert ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) challenging the Commissioner of Social Security's (the "Commissioner") denial of his application for Supplemental Security Income ("SSI"). (Compl., D.E. 1.) Presently pending before the Court are the parties' cross-motions for judgment on the pleadings. (Pl. Mot., D.E. 10; Comm'r Mot., D.E. 12.) For the following reasons, Plaintiff's motion is DENIED and the Commissioner's motion is GRANTED.

BACKGROUND

The background is derived from the administrative record filed by the Commissioner on May 9, 2019. (R., D.E. 9.) For purposes of this Memorandum & Order, familiarity with the underlying administrative record is presumed. The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.

Plaintiff applied for disability benefits on June 11, 2015, alleging disability since May 25, 1998. (R. 15; 153-59.) The claim was denied, Plaintiff requested a hearing (R. 15), and a hearing was held before the ALJ on February 5, 2018 (R. 38-61). In a March 6, 2018 decision, the ALJ found Plaintiff was not disabled. (R. 15-28.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-5.) This action followed.

I. The Hearing

    A. Plaintiff's Testimony

Plaintiff lives with his parents, sister, and nieces in Roslyn Heights, New York. (R. 41-42.) He has a high school diploma and graduated in 2008. (R. 44; Pl. Br., D.E. 10-1, at 3.) He took remedial college classes in 2008 and 2009 but failed most of them and dropped out. (R. 44-45.) The classes were "just too stressful." (R. 44.) In 2017, he worked for approximately three to four months as a movie theater usher and cleaner. The manager

let him go because the theater was not really making money. (R. 42-43.) He also worked at Stop and Shop for approximately one week. He started in the bakery department doing janitorial work; he was told he was not fast enough and in less than a day, was assigned to cart retrieval. He only did that for about five days. (R. 45-46.) He had problems following supervisors' instructions at his jobs but did not tell them that. (R. 54.) However, he testified that there would "not really" be a problem with him doing that kind of work in the future. (R. 50.)

Plaintiff does not drive. (R. 47.) He occasionally takes the bus depending on where he has to go. (R. 51.) He spends his time playing video games, hanging out with friends, looking for jobs, and doing household chores such as taking out the garbage, taking care of the family's two dogs, picking up his nieces from the bus stop, and doing his laundry. (R. 47-49.) Sometimes he goes to get himself take-out food. (R. 49.) He dresses himself each day but does not always shower on a regular basis because he gets "sidetracked." (R. 54.) His mother reminds him to shower and take his medication. (R. 54.)

Plaintiff takes seizure medications which control his seizures. He has not had a seizure in "a while" because he is on the medication. (R. 47.)

Plaintiff believes that his "anxiety" and "nervousness" prevent him from working. (R. 46.) He does not have any physical

3

limitations, "just mental" issues and "really bad anxiety . . . that holds [him] back." (R. 53.) By his own account, he has not seen a doctor or psychiatrist in "years," not since "high school." (R. 46.) He went to VESID (Vocational and Educational Services for Individuals with Disabilities) but they stopped working with him "the first time" because "they felt [he] wasn't ready to work and the second time just didn't work out . . . because [we] couldn't communicate with each other" because his cell phone did not get reception in the basement of his house and "they'd be calling [him] but [he] just wouldn't receive the calls." (R. 48.) Plaintiff missed appointments and consultations because he overslept and showed up to one interview unshaven with dirty fingernails. (R. 56.)

B. <u>Vocational Evidence</u>

As to jobs, a supported employment coordinator at Abilities, Inc., a Medicaid Service, stated that Plaintiff was unable to keep a job because he

> cannot always do the tasks that are required . . . works at a much slower pace than is required . . . does not take initiative but will just stand around if he has nothing to do . . . is resistant to suggestions from a job coach . . . has difficulty multi-tasking and saying focused . . . [and] has difficulty with short term memory.

(R. 207.) A VESID evaluation noted that Plaintiff "is able to follow simple written and oral instructions" but "all work [was]

4

being done at [a] very slow pace." (R. 465.) It identified his vocational limitations as having little to no peer interaction, needing a structured learning environment and a low pressure setting, having low energy, being unable to stay focused on tasks, and having little interest in any aspect of training. (R. 465-66.) During a five-day situational assessment, Plaintiff "complained of being tired, refused to remove his jacket and was frequently asleep and/or off task." He worked "at a slow pace with variable scores." "He showed little interest or motivation for training." (R. 468.)

Progress notes from his vocational services counselors indicate that Plaintiff was consistently unmotivated and failed to maintain contact. In February 2016, Plaintiff did not want onsite job coaching at Stop and Shop and was "not cooperating." (R. 561-62.) In March 2016, his counselor stated her "main concern with [Plaintiff] obtaining and maintaining a job is that he does not listen to the job developer and the job coach and follow[ ] through on suggestions. He tends to forget to call back and communication is challenging with him. He refuses to cooperate at times." (R. 556-57.) In May 2016, Plaintiff was "not motivated to work." He did not show up for a career fair and "did not show up to call of explain why" and his counselor learned "he overslept to 3:00pm on that day. With respect to his most recent interview, he showed up . . . looking unshaven with dirty fingernails. He was extremely

5

fidgety. At the interview he said he had a lifting limitation and that he would have to call his neurologist. It turns out that he called his neurologist and she said he does not have a listing limitation." (R. 541-42.) Because Plaintiff failed to communicate with his counselor, she recommended closing his case. (R. 542.) In November 2016, his counselor wrote that Plaintiff "has returned to his old habits of not returning any calls and continues to lack reliability. He forgets to hand in applications for six weeks and does not remember to call back with pertinent information which would help him obtain job interviews." (R. 531-32.) His case was closed in May 2017. (R. 529.)

Plaintiff also submitted educational records to the ALJ. (See R. 208-400, 431-456.)

   C.   Dr. Kathleen Acer

Psychologist Dr. Acer, Ph.D. (R. 518), performed a consultative examination of Plaintiff in October 2015 (R. 515-18). Plaintiff reported "ongoing anxiety on a situational basis" and feeling "anxious, nervous, jittery, restless, and tense at times, but not on a daily basis." He had "some difficulties at times focusing and concentrating." (R. 515.) He dressed, bathed, and groomed himself. He cleaned and did laundry, but generally did not cook or shop. He did not manage his own finances or drive. He reported adequate socialization with family and friends. (R. 517.)

Dr. Acer observed Plaintiff to be well-groomed and dressed appropriately, cooperative, coherent, clear, alert and oriented, with intellectual skills slightly below average. (R 516.) She diagnosed attention deficit/hyperactivity disorder ("ADHD") and unspecific anxiety disorder, and concluded that "the results of the evaluation [were] consistent with some psychiatric issues; however, in and of itself, it does not appear to be severely hampering functioning." (R. 517.) She opined that

> With regard to his vocational capacities, he can follow and understand simple instructions and directions, appropriately perform simple tasks, maintain attention and concentration at least on a short term basis, [and] maintain a regular schedule. He may have some difficulties at times learning and performing more complex tasks independently [and] adequately relating with others. He may have some difficulty dealing with stress.

(R. 517.) Dr. Acer recommended ongoing counseling and job coaching. (R. 517.)

D. Dr. John Heverin

Psychologist Dr. Heverin saw Plaintiff in March 2016. (R. 523-28.) Dr. Heverin administered cognitive tests and found Plaintiff's "general cognitive ability is within the low average range of intellectual functioning." (R. 525.) His "ability to sustain attention, concentrate, and exert mental control is in the low average range." (R. 526.) He had a "low level of adaptive functioning" in daily living skills. (R. 527.) "His social skills

7

are a strength that he may use to compensate for skills in other areas." (R. 528.) Dr. Heverin diagnosed Plaintiff with ADHD, predominantly inattentive type. (R. 528.)

E. Dr. Carl Anderson

Dr. Carl Anderson, a state agency psychiatric consultant, reviewed medical evidence and records (including but not limited to records from Plaintiff's pediatric neurologist Dr. Taff, Long Island Jewish Hospital, VESID, and Plaintiff's schools (R. 63-75)) and opined that Plaintiff's conditions "did not meet or equal any listed impairment." (R. 21, 69.) Dr. Anderson concluded that Plaintiff had mild restrictions in daily living activities; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. 69.) He classified Plaintiff's "overall cognitive ability . . . in the low average range" and stated that "from a psych perspective, there are no marked impairments in [Plaintiff's] ability to understand, concentrate, remember, adapt, relate, or persist with tasks on a sustained basis." (R. 74.)

F. Dr. Ingrid Taff

Plaintiff first saw Dr. Taff, a pediatric neurologist, in 2001 for seizures. (R. 484-87.) He continued seeing her over the years. In a 2015 medical source statement, she noted that Plaintiff "need[s] supported employment" and "very specific

8

direction and supervision" and was a "limited decision maker." (R. 486-87.)[1] She opined that he was "not ready for competitive employment." (R. 487.)

DISCUSSION

I. Legal Standards

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); Lockwood v. Comm'r of Soc. Sec. Admin., 914 F.3d 87, 90-91 (2d Cir. 2019); Burgess v. Astrue, 437 F.3d 117, 127 (2d Cir. 2008). If there is no legal error and the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

To be eligible for SSI benefits, a claimant must be aged, blind, or disabled as defined in 42 U.S.C. § 1382c and meet the resource and income limits specified in the Social Security Act. See 42 U.S.C. §§ 1381a, 1382(a); 20 C.F.R. § 416.202. For SSI

---

[1] Dr. Taff's (incorrectly denoted in Plaintiff's papers as "Dr. Taft") records are often illegible and difficult to read.

benefits, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A).  A claimant must establish he is unable to work due to a mental impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).  In evaluating disability in young adults,

> Once [the SSA has] evidence from an acceptable medical source that establishes the existence of at least one medically determinable impairment (MDI), [it] consider[s] all relevant evidence in the case record to determine whether a young adult[2] is disabled. This evidence <u>may</u> come from acceptable medical sources and from a wide variety of "other sources." <u>Although [the SSA] always need[s] evidence from an acceptable medical source, [it] will determine what other evidence [it] need based[s] on the facts of the case</u>.

Titles II & XVI: Documenting & Evaluating Disability in Young Adults, SSR 11-2P (S.S.A. Sept. 12, 2011), 2011 WL 4055665 (emphasis added).

In evaluating disability, the Commissioner must follow the familiar five-step process, and determine: (1) whether the

---

[2] SSR 11-2p applies to young adults aged 18-25, and applies here because Plaintiff was 24 years old when he filed for SSI. (Pl. Reply Br., D.E. 15, at 2.)

10

claimant is engaged in substantial gainful activity; (2) whether the claimint has a medically determinable impairment or a combination of medically determinable impairments that is severe; (3) whether the impairment(s) are severe enough to meet or medically equal the criteria in a listed impairment; (4) if no listed impairment, the claimant's residual functional capacity ("RFC"), or ability to do physical and mental work activities on a sustained basis, and whether the claimant can perform past relevant work with that RFC; and (5) if the claimant cannot perform past relevant work, whether he can perform any other work and whether jobs exist in the national economy. See R. 15-17; 20 C.F.R. §§ 404.1520, 416.920.

As relevant here, in evaluating a claimant with a mental impairment, the ALJ must apply a "special technique" commonly referred to as the "Psychiatric Technique" ("PRT"). 20 C.F.R. § 404.1520a. It requires the ALJ to assess how the mental impairment impacts four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3-4). More generally, "[a]ssessment of [mental] functional limitations is a complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

II. The ALJ's Decision

    A. The Mental Impairments

The ALJ concluded that Plaintiff's anxiety disorder, ADHD, and learning disorder were severe impairments, but that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 17-18.) Specifically, he found that Plaintiff's mental impairments did not "result in at least one extreme or two marked limitations in a broad area of functioning" as required by paragraph B of listings 12.02, 12.06, and 12.11. (R. 18.) He classified a "marked limitation" as a serious limit to functioning in an area independently, appropriately, and on a sustained basis and an "extreme limitation" as the inability to function in an area. (R. 18.)

First, the ALJ found Plaintiff had a moderate limitation in understanding, remembering or applying information. (R. 18.) He noted Plaintiff had "low average intellect and his ability to sustain attention, concentrate and exert mental control was also in the low average range." (R. 18.) He further noted that Plaintiff had obtained a high school diploma. (R. 18.)

Second, the ALJ found Plaintiff had mild limitation in interacting with others. He recounted that Plaintiff was assessed to have strength in social skills, had friends, and reported adequate socialization to an examiner. (R. 18.)

12

Third, the ALJ found Plaintiff had moderate limitation in concentrating, persisting, or maintaining pace. Although Plaintiff had been diagnosed with ADHD, the consultative examiner stated that Plaintiff could function in this area. (R. 18-19.)

Fourth, the ALJ found Plaintiff had mild limitation in adapting or managing himself. He noted that Plaintiff could engage in a wide variety of daily activities on his own. (R. 19.)

B. RFC Finding

The ALJ found Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: in additional to normal breaks for 95% of the work day can perform simple, routine, repetitive tasks but not at an assembly line pace; can frequently interact with supervisors and coworkers; and can frequently deal with changes in a routine work setting." (R. 19.)

C. Discussion

The ALJ gave great weight to the opinions of Dr. Heverin (because it was "based on a complete examination and [was] consistent with the other opinions in the record and [Plaintiff's] testimony"), Dr. Acer ("since it [was] based on a comprehensive evaluation and is consistent with the other opinions in the record"), and Dr. Anderson (because it was "expert opinion evidence from a non-examining source"). (R. 21-22.) He gave some weight to opinions from vocational counselors and evaluations because

13

they were based on complete examinations and consistent with other opinions in the record. (R. 20, 21.) The ALJ did not accord Plaintiff's school records any weight because they were "dated considerably prior to the application date . . . [and were] not probative of [Plaintiff's] condition as of the application date." (R. 22.)

Based on the foregoing, the ALJ concluded that Plaintiff was not disabled. (R. 23.)

III. Analysis

Plaintiff argues that (1) the ALJ failed to properly perform a listings analysis, and (2) the ALJ erred in providing great weight to the opinion of a state agency consultant. (Pl. Br., at 1.) The Commissioner contends that (1) the ALJ properly performed a listings analysis and concluded that Plaintiff did not meet the Paragraph A or B criteria in Listing 12.02 or 12.11, and (2) the ALJ properly assigned great weight to the state agency consultant's opinion. (Comm'r Br., D.E. 13, at 21, 23.) The parties do not argue over the ALJ's physical disability and RFC determinations.

Plaintiff claims impairment under Listing 12.11 (Neurodevelopmental Disorders) Paragraphs A and B. (Pl. Br. at 11-13.) Impairment under Listing 12.11 requires

> A. Medical documentation of the requirements
> of paragraph 1, 2, or 3:
>     1. One or both of the following:

>                a. Frequent distractibility,
>                difficulty sustaining attention,
>                and difficulty organizing tasks;
>                or
>                b. Hyperactive and impulsive
>                behavior (for example, difficulty
>                remaining seated, talking
>                excessively, difficulty waiting,
>                appearing restless, or behaving as
>                if being "driven by a motor").
>           2. Significant difficulties learning
>           and using academic skills; or
>           3. Recurrent motor movement or
>           vocalization.
>      . . .
>
>      B. Extreme limitation of one, or marked
>      limitation of two, of the following areas of
>      mental functioning [ ]:
>           1. Understand, remember, or apply
>           information [ ].
>           2. Interact with others [ ].
>           3. Concentrate, persist, or maintain
>           pace [ ].
>           4. Adapt or manage oneself [ ].

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.11.

"SSR 11-2p 'instructs that ALJs consider evidence from other sources who are not medical sources, but who know and have contact with the young adult, such as family members or educational personnel, to assist in evaluating the severity and impact of a young adult's impairment(s).'" Coppola v. Berryhill, No. 18-CV-599, 2019 WL 1292848, at *20 (S.D.N.Y. Mar. 21, 2019) (quoting Samuel v. Comm'r of Soc. Sec., 14-CV-4634, 2015 WL 5774850 at *13 (E.D.N.Y. Sept. 30, 2015). "SSR 11-2p permits consideration of school records for young adults . . . ." Brown v. Comm'r of Soc. Sec., 17-CV-7566, 2018 WL 4210134 at *6 (E.D.N.Y. Sept. 4, 2018).

While an ALJ <u>may</u> consider educational records, they are not <u>required</u> to. See SSR 11-2p(I)(C)("Evidence from school programs, including secondary and post-secondary schools, <u>can</u> also help us evaluate the severity and impact of a young adult's impairment(s)" (emphasis added)); SSR 11-2p(II)(A) ("we <u>may</u> have evidence about a young adult's functioning from school programs, including IEPs. This evidence <u>may</u> indicate how well a young adult can use his or her physical or mental abilities to perform work activities. . . . [and] school-reported difficulties <u>might</u> indicate difficulty with work activities" (emphasis added)).

Plaintiff's primary listings argument is that the ALJ did not consider all record evidence, including his school records and vocational program records. (Pl. Reply, D.E. 15, at 3.) He claims that "the ALJ only considered three forms of evidence, the consultative examiner Dr. Acer's report, the opinion of the State Agency consultant and [Plaintiff's] brief testimony." (Pl. Br. at 10.) This is inaccurate. The ALJ gave great weight to Dr. Acer, Dr. Anderson and Dr. Heverin's opinions. He also gave some weight to the reports from Plaintiff's vocational counselors. (R. 20-21.) The ALJ considered Plaintiff's own--not necessarily brief--testimony about his limitations and daily activities. Although the ALJ did not explicitly consider the school records, he noted in his listings discussion that Plaintiff had obtained a high school diploma and was not in special education classes. (R. 18.)

16

Plaintiff's below average scores in certain categories and his documented unwillingness and lack of cooperation in connection with working does not compel the conclusion that he is disabled to the point where he cannot work. See Saenz v. Berryhill, No. 16-CV-574, 2017 WL 1944158, at *7-*8 (S.D.N.Y. May 10, 2017) (ALJ properly gave great weight to licensed clinical social worker's reports that the claimant did not "want" to work despite being able to even where it conflicted with treating physician's opinion that the claimant had "moderate limitations with regard to maintaining action for two hours periods of time, performing regularly scheduled activities, punctuality, accepting instruction, performing consistently without an unreasonable number of rests, completing normal work week without interruption, and working in coordination with or near others without being distracted."). Notably, in 2017, after applying for SSI benefits, Plaintiff worked as an usher (one of the jobs the vocational expert opined he could perform (R. 59)) for three to four months. By his own account, he obtained that job on his own, without assistance from a vocational service, and he was let go due to the business's financial constraints, not because of his job performance.

All opinions given great weight by the ALJ indicate that Plaintiff is capable of working in accordance with the given RFC. Plaintiff gives no reason why this evidence should be discounted.

17

Even if there is evidence in the record that could support Plaintiff's claims, "'[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder.' The ALJ's conclusion that Plaintiff was not disabled was adequately supported by substantial evidence, not legal error, and must be upheld." Id. at *11 (quoting Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). Accordingly, the Court finds that the ALJ's listings conclusion is supported by substantial evidence.

Plaintiff also argues that the ALJ erred in giving great weight to state agency consultant Dr. Anderson's opinion and not giving adequate reason for doing so. (Pl. Br. at 13-14.) He claims that "it is not even clear whether the consultant is a psychologist, psychiatrist or neurologist." (Pl. Br. at 14.) However, the record demonstrates that Dr. Anderson is a psychiatrist because it references "Code 37" next to his name. (R. 74; see SSA Program Operations Manual System ("POMS") MS DI 24501.004(B), Medical Specialty Codes, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004). The ALJ did not err in giving Dr. Anderson's opinion, which was based on a thorough review of medical evidence spanning from 2005 to 2015,

great weight.[3] In any event, any perceived error would be harmless, as the ALJ did not base his entire decision on Dr. Anderson's evaluations--the ALJ also afforded great and some weight to other sources in arriving at his conclusions.

CONCLUSION

For the foregoing reasons, the Commissioner's motion (D.E. 12) is GRANTED and Plaintiff's motion (D.E. 10) is DENIED. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   November  25 , 2019
         Central Islip, New York

---

[3] Plaintiff makes no treating physician argument regarding Dr. Taff. In any event, Dr. Anderson reviewed Dr. Taff's records in formulating his opinion.